6666

DUNCAN v. HEYWARD.

OWENS v. HEYWARD.

1. Public Schools.—The State Board of Education may provide by contract with publishers of school text-books to maintain at the State capital a central wholesale depository from which its agencies and the county depositories may be supplied at a discount of not less than ten per cent.

2. Equity—Injunction.—If State Board of Education have acted without warrant of law in providing a central depository for text-

books, the injury would be common to the tax-payers of the State, and remedy would be suit by State and not proceeding for injunction by individual tax-payer.

3. Ibid.—Ibid.—State Board of Education.—Court of Equity will not restrain acts of State Board of Education at instance of individual tay-payer, where his interest is small and where its plans have been undertaken and carried almost to completion, except upon the clearest showing that the Board has transcended its statutory powers.

Before Mr. Justice Woods, July, 1906.   Affirmed.

Petition by W. H. Duncan and one by W. R. Owens against D. C. Heyward, Governor, *ex-officio* chairman; O. B. Martin, Superintendent of Education; W. K. Tate, J. B. Boland, D. W. Daniels, A. R. Banks, H. M. Ayer, A. G. Rembert and A. J. Thackston, constituting the State Board of Education, for injunction.   From order of Mr. Justice Woods refusing a temporary injunction, petitioners appeal.

The petitions are the same.   One is:

"To the Honorable, the Justices of the Supreme Court:

"Your petitioner would respectfully show unto the Court:

1. "That your petitioner is a citizen and resident taxpayer of the County of Barnwell, having children of lawful school age in attendance upon the free public schools of said county, in which schools only such books are permitted to be used as are prescribed by the State Board of Education, pursuant to the power vested in it by section 1184 of the Civil Code; and your petitioner is required to pay for said books such prices as said board may contract for with the publishers thereof.

2. "That on the 20th day of January, 1906, the Governor, as *ex-officio* chairman of said State Board of Education, issued his proclamation, 'To Whom It May Concern,' calling for 'bids for contracts to furnish for use in the public schools in the State, for a period of five years, from July 15th, 1906, * * * a uniform series of text-books as described,' and accompanying said proclamation was a copy of resolutions of said board and a form of the required contract, all of

which were designed and intended to inform the bidders of the requirements of said board; a copy of which proclamation, resolutions and contracts is hereto attached as a part of this petition.

3. "That on the 22d day of June, instant, pursuant to said proclamation and resolutions, the bids which had been filed by competing publishers were opened and considered, and certain school books adopted thereunder, to be contracted for under the terms of the proposed contract, for use in the free public schools.

4. "That in the third section of said proposed contract it is provided, 'The party of the second part (meaning the publishers) further agrees to and with the party of the first part (meaning said board, the State) that it will furnish the books named in this contract to its own agencies, to the county depositories, and to individuals in the State, through a central depository, to be located in the City of Columbia, in the County of Richland, said depository and its manager to be approved by the State Board of Education; and it is further agreed, that if any books are furnished to the above-named agencies, depositories and individuals, in any other manner, said books shall be furnished at the same price and upon the same terms as those furnished through the State depository.' And your petitioner is informed and believes, and so alleges, that all of the bidders for contracts to furnish said books thereunder considered the extra expense which would be incurred in establishing and maintaining the required 'the central depository,' and added the estimated amount thereof, to wit: ten per cent., to the cost price of the books to the purchaser, over and above what said books would have been sold at, if the board had not required the maintenance of said newly created 'central depository,' and required all of said books furnished under said contract, to be furnished through the same.

5. "That by sec. 1184 of the Civil Code, 1902, vol. I, 'the general powers of the board' are defined, *inter alia,* by the fifth subdivision as follows: 'To prescribe and to

enforce, as far as practicable, the use of a uniform series of text-books in the free public schools of the State; to enter into an agreement with the publishers of the books prescribed, fixing the time of prescription and the price above which the books shall not be retailed during the period of prescription, and a rate of discount at not less than which the books shall be furnished to the retail dealers in this State; to require the publishers, in the discretion of the board, to establish in each county one or more depositories of their books within the State, at such place or places as the board may designate, and *where such books may be obtained without delay;* and to exact of the publishers a bond in the sum of not less than ·five thousand dollars conditional for the faithful performance of the agreement, and with a penalty of twenty-five dollars for each violation of the agreement, the form and execution of the bond to be approved by the Attorney General of the State, which agreement and bond shall be deposited with the State Treasurer, all recoveries thereon to go into the State Treasury for school purposes.'

"And in sec. 1239 of said Code it is prescribed, 'The county boards of education of the several counties of this State are hereby authorized and required to set aside from· the public school fund of their respective counties an amount not exceeding five hundred dollars, for the purpose of providing the pupils attending the free public schools of their counties with school text-books at actual cost or exchange prices. The amount so set aside from the school funds shall be paid to the county superintendent of education by the county treasurer, out of the unappropriated general school funds in his hands, on the warrant of said county board of education, and shall be and remain a permanent fund in the hands of the county superintendent of education, to be used in purchasing and keeping on hand school text-books for sale to pupils attending the free public schools of his county, for cash, at actual cost or exchange prices, and to be used for no other purpose, and in no other manner; and the place where said school text-books are kept and sold shall be

deemed depositories, under the control of the State, as provided in the *seventh article, or provision, in the contract made in 1893 with the publishers of school text-books.* That the county superintendent of education in every county in the State be, and he is hereby, required to keep his office open each day of the week prior to the time appointed for schools to open in his county, and for one week immediately after, and for at least one day in each week during the remainder of the school term, for the convenience of those wishing to purchase books.'

"The 'seventh article or provision' referred to in the above section is as follows: '7th. That if the Legislature of the State, or the State Board of Examiners, should thereafter provide for a system of depositories under the control of the State, they agree to furnish their adopted books to the depositories at their best rate and terms of exchange, their best prices and terms of introduction, and their greatest rate of discount, set forth in their original and supplemental propositions to the State Board of Examiners, pay the transportation charges on all cash orders for such books when shipped by freight, and to so ship when so ordered, and to make no charge at any time for box, packing or drayage, and to conform to all reasonable orders of the State board touching the regulations of same.'

6. "That your petitioner is informed and believes that the amount annually expended for the purchase of school books for the free public schools of the State for which said books are prescribed is at least one hundred thousand dollars, and it is estimated that the entire amount of sales for the succeeding five years provided for in the proposed contract is between five hundred thousand and six hundred thousand dollars, of which amount, as above set forth, ten per cent. over and above all other expenses incurred in distributing the school books is intended to go to the 'central depository' in payment of services rendered and expenses incurred by said central depository, exclusive of and in addition to the cost and expenses of maintaining the various county deposi-

tories, and is an additional expense which would not be incurred but for the illegal establishment of said 'central depository,' and the incurring of said expense is without the warrant of law, and is an indirect tax illegally levied upon the patrons of the public schools, and the same is practically bonus contributed to private enterprise.

7. "Your petitioner is informed and believes, and so alleges, that since the date of the acceptance of the bid and the adoption of said books for the next succeeding five years as above mentioned, to wit: on the — day of June, instant, the various publishers, or a majority thereof, whose bids had been accepted by the board, met and selected, as the manager of the 'central depository,' in the City of Columbia, a retail book concern of said city, and then and there agreed to give as compensation to said book concern, for acting as the said central depository, ten per cent. of the gross price of all books to pass through the hands of said dealer or shipped to county depositories or individuals by its order, under its direction or through said 'central depository,' and said extra ten per cent. being in addition to the net price of said books as furnished to the county depositories, and the ten per cent. allowed said county depositories for their immediate remuneration and expense.

8. "And your petitioner contends and charges that the amount so allowed to the central depository is an additional amount over and above the actual cost of the books which the law contemplates shall be charged to the patrons of the schools, and being charged solely for the maintenance of the central depository, is a violation of the law in that it increases the number of middlemen acting between the publisher and the ultimate purchasers, to the cost and damage of the latter.

9. "Your petitioner respectfully contends that by the statutes of this State the cost of the books to patrons of the school shall be the net price received by the publishers, plus the percentage allowed to the local county depositories, and that it is unlawful and beyond the power of the board to add, by any means whatsoever, and especially by newly created

and additional agencies, any sum, however small, to the cost of these books which the purchaser is required to pay.

10. "That the said third section of the proposed contract in requiring that books furnished to 'individuals in any other manner' than 'through the State depository' 'shall be furnished at the same price and upon the same terms as those furnished through the State depository,' compels the patrons of the school, when procuring the books directly from the publishers without the intervention of county depositories or of the State depository, to pay ten per cent. beyond the price for which the books would otherwise be provided to them, and that said ten per cent. is either a bonus given by the board to the State depository for services not rendered or is allowed to the publishers in addition to the cost, and is a penalty imposed upon the individual for failing to procure said books through the county depositories or the State depository, and is in violation of the legal rights of your petitioner and the other patrons of the schools, and without warrant of law.

11. "That the first section of said contract is as follows: 'That the party of the second part hereby covenants and agrees to and with the party of the first part, to establish and maintain from and after the 1st day of September, 1906, up to the 31st day of August, 1911, not fewer than three depositories or agencies in each and every county of the State, said depositories to be approved by the State Board of Education, where there shall be constantly on hand for sale to the children attending the public schools a sufficient number of the books hereinafter named, and at the prices hereinafter named in this contract, to supply the demands, the same to be established at such places as will afford proper facilities for the purchase of such books; provided, however, that nothing herein contained shall prevent the said party of the second part from establishing such additional agencies or depositories as it may deem necessary and proper, it being understood that the failure of the party of the second part to supply a sufficient number of depositories or agencies as may

be determined by the State Board of Education of South Carolina shall operate a forfeiture of this contract.'

12. "That the said proposed contract contains many provisions not warranted by law, as a mere inspection of the same will show; and therein it is required that the bond provided for shall contain conditions not in accordance with law, and the said proposed contract attempts to change the procedure, which has prevailed in the courts of this State for a century, for the collection of official or statutory bonds.

13. "That your petitioner respectfully contends that the county depositories provided, by the statutes of this State, are amply sufficient, together with the services of the county superintendents of education, as means for the efficient distribution of all the school text-books to be used in the free public schools of this State, and that the additional agencies cannot legally be created at the expense of the people by the said Board of Education, and that an attempt so to do is utterly *ultra vires.*

14. "That your petitioner is informed and believes that it is the intention of the said Board of Education, pursuant to the proclamation, resolutions and 'adoption' before mentioned, to enter, with the publishers successfully bidding thereunder for the furnishing of the school books of the State, into a contract identical with, or similar to, the proposed contract before mentioned, embodying all of the essential provisions thereof; and that unless this honorable Court shall enjoin said board from attempting to execute said contract, the same will be entered into between said publishers and the State board, and that your petitioner and the other patrons of the public schools of the State will have no remedy or relief against the enforcement of its unjust and unlawful terms.

15. "That your petitioner has no adequate remedy at law other than as this honorable Court may grant in its proceedings.

16. "That the conditions upon which the bids were made, having required the establishment of the illegal 'State deposi-

tory,' it is respectfully contended, that the bidding and 'adoption' before mentioned were not such as is contemplated by law; and, in that the bids were not for the cost of the books, such as is estimated by law, that the action of the board in the premises was null and void.

17. "That on account of the matters hereinbefore alleged the petitioner charges that not a single legal and lawful bid was made by any book publishing house, and on that account no legal adoption or award could be made by the said board to any of said publishing houses so bidding; that said bids were caused directly and immediately by the action of the said board in requiring said bidding publishing houses to bid with reference to said central depository and the additional cost and expense of school books necessitated thereby.

"Wherefore, your petitioner prays that the said State Board of Education be enjoined from entering into the proposed contract or doing or performing any other act pursuant to said illegal bidding and awarding of the contract, and for such other and further relief as may be just and equitable."

## ANSWER.

"The defendants above named, answering the petition herein, allege:

1. "As to the first paragraph thereof, that they are informed and believe, and allege, that the said W. H. Duncan is at present a taxpayer and patron in the Barnwell Graded School District, which school district was created by an Act of the General Assembly approved December 23d, 1886. (See vol. XIX, Statutes of South Carolina, pages 552 and 553.) That sec. 5 of art. XI of the Constitution, by special provision, retains and maintains the integrity and powers of such special school district. That said Act (1886) provides that the board of trustees of the Barnwell Graded School District shall have the following powers and duties:

1. "To discharge the duties of school trustees, and have

all the powers, privileges, rights and liabilities now possessed by and pertaining to school trustees.

2. "To determine the studies and class books to be used in the schools of said district.

"That they are informed and believe that the said trustees adopt their own books and fix their own prices, independent of the adoption of the State Board of Education; and that the said W. H. Duncan, as a citizen of said school district, is exempt from the adoption and prices fixed by the State Board of Education, and that he has relief through such trustees without petitioning to the Courts, if the State Board of Education should provide unsatisfactory books and unsatisfactory prices.

"And these defendants allege that they have no knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first paragraph of the petition except as the same may have been hereinafter admitted.

2. "As to the second paragraph of the petition, they admit the allegations thereof.

3. "As to the third paragraph of the petition, they admit the allegations thereof.

4. "As to the fourth paragraph of the petition, they admit that in the third section of the said contract it is provided as therein alleged, but they deny each and every other allegation in said fourth paragraph of the petition contained.

5. "As to the fifth paragraph of the petition, they admit the allegations of the same, except that in quoting sec. 1239 of the Civil Code, the date of the contract therein referred to is incorrectly given as '1903,' whereas said date as given in said sec. 1239 is '1893,' and they allege that the said 'contract made in 1893 with the publishers of school textbooks' has long since expired by its own limitation, and that the said 'seventh article or provision' thereof has no longer any force or effect.

6. "As to the sixth paragraph of the petition, they admit so much thereof as alleges the amount of the annual expend-

iture for school books in this State, and the estimated amount for the next five years, but deny each and every other allegation thereof except as hereinafter admitted.

"And they allege that the ten per cent. on the retail price of the books, which is to go to the manager of the Central Depository, is in lieu of and supersedes the greater expense that would otherwise be incurred by the publishers at their offices in Richmond, New York, Boston, Chicago, and elsewhere, for storage, insurance, taxes, extra clerk hire, extra bookkeepers, the additional expense of collecting small amounts scattered over the large area of territory and the excess of freight and express charges that would be involved in shipping the books in small lots to the local depositories in the several counties as compared with shipping same in large or carload lots to the Central Depository at Columbia, all the freight and express charges of distributing books from the Central Depository at Columbia to the local depositories in the several counties being included in and covered by the said ten per cent. going to the manager of said Central Depository.

7. "As to the seventh paragraph of the petition, they admit the selection of a manager of the Central Depository at Columbia, as therein alleged, and that such manager is to receive ten per cent. on the retail prices of the books handled through such Central Depository, but deny each and every other allegation of said paragraph except as the same may be admitted in the next preceding paragraph of this answer.

8. "As to the allegations of the eighth paragraph of the petition, they admit the same.

9. "As to the ninth paragraph of the petition, they deny the allegations thereof.

10. "As to the tenth paragraph of the petition, they deny the allegations thereof.

11. "As to the eleventh paragraph of the petition, they admit the allegations thereof.

12. "As to the twelfth paragraph of the petition, they deny the allegations thereof.

13. "As to the thirteenth paragraph of the petition, they deny the allegations thereof.

14. "As to the fourteenth paragraph of the petition, they admit the allegations thereof, except that they allege that the contract with some of said publishers has already been executed, and except that they deny that the terms thereof are either unjust or unlawful, and further deny that petitioner has no remedy or relief other than the injunction sought by him in this action.

15. "As to the fifteenth paragraph of the petition, they deny the allegations thereof.

16. "As to the sixteenth paragraph of the petition, they deny the allegations thereof.

17. "As to the seventeenth paragraph of the petition, they deny the allegations thereof.

18. "They deny each and every allegation of the petition not hereinbefore admitted.

19. "And further answering the petition herein, these defendants allege that pursuant to the statutes in such case made and provided, and pursuant to the proclamation of Governor D. C. Heyward, Chairman of the State Board of Education, and pursuant to the resolutions of the board, they met as the State Board of Education of South Carolina on the 22d and 23d days of June, 1906, and adopted a series of text-books for the five years next ensuing from and after September 1, 1906, after the bids of the competing publishers had been duly filed and examined, and that some of the succesful bidders had signed their contracts and executed and filed their bonds in the office of the State Board of Education before the commencement of this action, and as defendants are informed and believe, have already begun the manufacture of the special South Carolina edition of said text-books with the indorsements required by this board printed on the back thereof; that the form of contract between the State and the publishers adopted by the board is in strict accordance with the statutes of this State, and a copy of said contract is hereto appended

as a part of the answer, which said contract was duly approved by the Attorney General of this State, and reference thereto is hereby craved, especially to the last sentence of the third paragraph thereof added thereto by way of amendment by the advice of the Attorney General; that the method of supplying text-books to the patrons of the free public schools of this State as outlined in said contract was determined upon by said board after careful consideration as not only in accordance with law, but as the best possible method from the standpoint of convenience and economy to the patrons of said schools; that under said method, the patrons of said schools will be able to procure said books with greater convenience and at as low or lower prices than under the next previous contract of 1900, although in many respects the books to be furnished under the present contract are much superior in quality to those furnished under the former contract of 1900; that under the former contract, the said text-books were often sold by the retail dealers to the patrons of the schools at 25, 40, 50, 60 and even 75 per cent. above the contract price, whereas under the present contract it will be impossible to sell said books to the patrons of said schools at anything above the contract retail price stamped on the back of each book; that under the present arrangement many thousands of dollars will be saved to the patrons of said schools; that all heretofore existing contracts for school books have expired by their own limitations, and that the State of South Carolina has now no contracts for text-books for its schools, except those contracts now made and being made which plaintiff seeks to enjoin; that the public schools of the State will begin to open about the middle of the month of August next, and they will be seriously disorganized and embarrassed by even a temporary injunction pending this action restraining these defendants from executing the said contracts agreed on by them with the publishers.

"Wherefore, these defendants pray that the interlocutory

injunction herein may be vacated, and that the petition herein may be dismissed."

## OPINION BY MR. JUSTICE WOODS.

"This is an application by the plaintiffs, as resident tax-payers and patrons of the public schools, for a temporary injunction to restrain the defendants, constituting the State Board of Education, from entering into contracts with certain publishers to furnish school books for the free public schools of the State. The contract which all publishers submitting bids were notified they would be required to sign, contained the following clauses, which it is alleged were in violation of statute law, in that they provided for an additional charge of ten per cent. to be allowed to a State Depository, which the State Board of Education had no authority to establish themselves or allow the publishers to maintain: 'The party of the second part further agrees to and with the party of the first part, that it will furnish the books named in this contract to its own agencies, to the County Depositories, and to individuals in the State, through a Central Depository, to be located in the city of Columbia, in the County of Richland, said depository and its manager to be approved by the State Board of Education; and it is further agreed, that if any books are furnished to the above named agencies, depositories and individuals, in any other manner, said books shall be furnished at the same price and upon the same terms as those furnished through the State Depository. The party of the second part further agrees that the manager of the Central Depository shall be the agent of the publisher, and shall accept any and all service in the name and stead of the party of the second part. The party of the second part further agrees to and with the party of the first part, that it will sell, furnish and deliver to the agencies, at a discount of not less than ten per cent., and that the books shall always be furnished to the County Depositories at as low a price as they are furnished to any agency or dealer in the State;

and it is further agreed, that when books shall be ordered by individuals, they shall be delivered to them at the prices printed on the back, free of transportation to such individuals.' The argument is that the publishers in making their bids estimated this additional ten per cent. as a part of the price of the books, which the plaintiffs allege constituted an unwarranted and unreasonable burden on the patrons of the public schools.

1. "If the Board of Education could suggest no good to the cause of public education and no benefit to the individual patrons of the schools to be expected from requiring the publishers to maintain a Central Depository, then their action might well be regarded capricious and arbitrary, possibly warranting the interference of the Court. But it cannot be doubted that a Central Depository at the capital of the State, where all the books prescribed are always on hand, will enable the local County Depositories and individual purchasers to procure books with much more dispatch and facility than they could if it were necessary, as it has heretofore been, to make separate orders to several publishers in cities far distant from the purchaser and from each other. In addition to this, it is perfectly manifest that the publishers, in submitting their bids based on the requirement that they should maintain the Central Depository at a cost of ten per cent. on the sales, must have estimated some compensatory reductions of expense—such, for example, as the difference in freight from distant points on small packages of books and books shipped in large lots, the difference in the cost of clerical force necessary to get together and ship a very large number of small orders and a small number of large orders. In other words, the ten per cent. would represent to a large extent the difference between the cost of handling the goods by wholesale and retail, the Central Depository undertaking for the publishers the trouble and expense of retailing the books as a general warehouse. These grounds existing for the Board of Education to con-

16—78

sider the establishment of the Central Depository wise; and no charge being made of a lack of good faith or zeal for the public welfare, it is not for the Court to make nice calculations and issue an injunction on the ground that its judgment of the matter is superior to that of a board designated by the law as especially qualified to deal with such questions.

"The plaintiffs insist, however, that the county superintendent of education is required to furnish books at the lowest publishers' prices under the following provision of the law: 'The county boards of education of the several counties of the State are hereby authorized and required to set aside from the public school funds of their respective counties an amount not exceeding five hundred dollars, for the purpose of providing the pupils attending the free public schools of their counties with school text-books at actual cost or exchange prices. The amount so set aside from the school funds shall be paid to the county superintendent of education by the county treasurer, out of the unappropriated general school funds in his hands, on the warrant of said county board of education, and shall be and remain a permanent fund in the hands of the county superintendent of education, to be used in purchasing and keeping on hand school text-books for sale to the pupils attending the free public schools of his county, for cash, at actual cost or exchange prices, and to be used for no other purpose, and in no other manner; and the place where said school text-books are kept and sold shall be deemed depositories, under the control of the State, as provided in the *seventh article or provision in the contract made in 1893 with the publishers of school text-books.* That the county superintendent of education in every county in the State be, and he is hereby, required to keep his office open each day of the week prior to the time appointed for the school to open in · his county, and for one week immediately after, and for at least one day in each week during the remainder of the school term, for the convenience of those wishing to pur-

chase books.   *   *   *   *Provided, however,* That nothing herein contained shall prevent the keeping of said depository in some other place than the office of the superintendent of education, if in his judgment it is best to do so.'

"The contract of 1893 for school books referred to in this statute is now at an end, and when the new contract now under review was before the board of education for consideration, there was no power anywhere to require the publishers to furnish books in future to county superintendents or other depositories at ten per cent. less than they now agree to furnish them through a State Depository. Unquestionably it is still the duty of the board of education to use all reasonable means to secure the lowest possible prices consistent with the successful conduct of the schools; but as we have seen, there was some ground for the board to reach the conclusion that by the use of a Central Depository the convenience of patrons might be greatly promoted, with such advantages and savings to the publishers as would enable them to pay the ten per cent. for maintaining it without increasing the price of the books in the hands of the pupil, or 'the first cost,' referred to in the Act of 1905 (24 Stat., 877).

"The plaintiffs earnestly maintain, however, that the defendants are impliedly forbidden by the statute law of the State to require the establishment of a Central Depository. Sec. 1175 of the Civil Code provides that the State Superintendent of Education 'shall have general supervision over all the public school funds,' and that 'he shall secure by and with the advice of the State Board of Education uniformity in the use of text-books throughout the public schools of the State. and shall forbid the use of sectarian or partisan books of instruction in said schools.' The general powers of the State Board of Education are thus laid down in sec. 1184 of the Civil Code: 'The State Board of Education shall have power: 1st. To adopt rules and regulations not inconsistent with the laws of the State for its own government and for the government of the free public schools.'

The statute then confers in these words the specific power to provide for a uniform system of text-books: 'To prescribe and to enforce, as far as practicable, the use of a uniform series of text-books in the free public schools of the State.' If the statute had stopped here, doubt would hardly be entertained that in carrying into effect the plan of using a uniform system of text-books, the State Board of Education, under the broad power to adopt regulations for the government of the public schools, would have the power to use such means as it thought wise to have the uniform series of books reach the children with the least possible expense and inconvenience, and that requiring the establishment of a Central Depository at the capital would be a regulation fairly adapted to that end. The petitioners maintain, however, that the power to require the establishment of a Central Depository is denied by necessary implication by the following clause of the statute, relating to the powers of the State Board of Education: 'To require the pubishers, in the discretion of the board, to establish in each county one or more depositories of their books within the State, at such place or places as the board may designate, and where such books may be obtained without delay.' The argument is that the 'one or more depositories' established in each county must be all of the same class and primarily serve for the distribution of books for the county where it is located. But there is no indication in the statute that the board of education may not require one of these depositories at a convenient location to be used as the wholesale warehouse from which the books may be distributed to the others, and the Court would be going far beyond its function to undertake to write into the statute such a limitation upon the broad powers conferred upon the board of education.

"The fact that sec. 1239, which relates entirely to the county board of education and the county superintendent, having charge of purely county affairs, provides that the places where the books are supplied locally shall be deemed depositories, does not signify that the State Board of Edu-

cation, having the right to make regulations for the government of the schools of the entire State, may not require an agency performing a larger function in the distribution and sale of books which would also be in its nature and functions a legal depository.

"I think, therefore, the injunction should be refused on the ground that the board of education has not acted beyond the power conferred by the statute law of the State in requiring the establishment of the Central Depository by the publishers who are to furnish the text-books for the public schools of the State, and I should be content to rest my conclusion on this ground alone, but there are other reasons for refusing the injunction.

2. "The injury which the petitioners allege they would suffer does not differ in kind from that which would be suffered by the people at large patronizing the public schools, and if there had been any cause of action, the suit should have been instituted by or on behalf of the State. *Manson* v. *R. R. Co.,* 64 S. C., 120, 41 S. E., 834.

3. "But, aside from that, the personal interest of the petitioners is exceedingly small, it being impossible that it could amount to more than five or six dollars each year. On the other hand, the plans devised by the State Board of Education for furnishing the books have been undertaken and carried almost to completion, and have presumably received full consideration with due solicitude for the public interest. The Court should, therefore, require the clearest showing not only of material injury to the petitioners but also that the board of education has transcended its statutory powers. So far from there being such a showing, it is clear to my mind, for the reasons already stated, that the board has not exceeded its powers.

"The petitioners do not allege that they had no knowledge of the terms of the contract which they assail before the bids of the publishers were received, and as far as

appears from the complaint, they have waited without excuse until the board has expended much time and labor; and their delay, if the injunction should now be granted, would greatly disarrange the public business. The motion for a temporary injunction is refused and the temporary restraining order revoked.

"The petitioners filed separate petitions, but the cases were substantially the same, and it was agreed by counsel that they should be disposed of as if only one case had been presented."

Petitioners appeal on following exceptions:

I. "His Honor erred in dissolving the temporary restraining order, the actions being brought solely for an injunction, and a *prima facie* case being made for the same by the verified petitions.

II. "His Honor erred in not granting an interlocutory order, restraining the respondents from entering into the contract mentioned in the petitions until the cases could be heard by the Court upon their merits, the actions being brought solely for an injunction, and the verified petitions making on their face a *prima facie* showing for same.

III. "His Honor erred in dissolving the temporary restraining order and in refusing to grant an interlocutory order restraining the defendants from executing the contract mentioned in the petitions, because as the proceedings were brought solely for an injunction, and as the verified petitions made a *prima facie* showing therefor, he could not determine the questions raised by the petitions upon the showing before him adversely to the petitioners without denying to them a hearing upon the merits in the mode prescribed by law.

IV. "His Honor erred in holding that the State Board of Education had authority to authorize and to establish a Central Depository and to provide for and insert in the contracts with the publishers whose books were adopted a provision creating this Central Depository because, under and

by the terms of the contract set out in the petition, and which the State Board of Education was about and intended to enter into, the price of school books was made ten per cent. higher than the same should have been, and would have been, had the said board not established said Central Depository, and required all bids to be made with reference thereto and the additional expense thereby occasioned.

V. "His Honor erred in not holding that the State Board of Education was without authority to create or establish said Central Depository, the law providing how, when and where depositories should be established, and the compensation to be allowed to those keeping the same.

VI. "His Honor erred in not holding that, as the State Board of Education was the creature of the statute, and as it had no authority other than therein given to it, and as such statute gave it no authority to establish a Central Depository, but only to establish County Depositories, it was without power to create and establish this Central Depository or to require the publishers to bid with reference thereto and the additional expense and cost in text-books occasioned thereby.

VII. "His Honor erred in not holding that the only depositories authorized by law are County Depositories, and that consequently the State Board of Education had no authority to establish a Central Depository for the entire State—really a State Depository—and thus add to the cost of the text-books in the free public schools.

VIII. "His Honor erred in holding that the petitioners could not bring and maintain these proceedings, but that they could only be brought by or on behalf of the State, as the alleged injuries did not differ in kind from that suffered by the people at large.

IX. "His Honor erred in holding that the personal interests of the petitioner was exceedingly small, and, that on that account, the wrong complained of should not have the same standing in Court it would have had had his interests been exceedingly large, because, while the individual cost

to the paintiff of paying the additional expense occasioned by the Central Depository may be small, yet thousands and thousands of school patrons are similarly affected.

X. "His Honor erred in holding that the petitioner had waited without excuse to bring these proceedings until the board had expended much time and labor in the adoption of text-books, because, as it was impossible for the plaintiff to have known of the purpose or intention of the State Board of Education with regard to a Central Depository, a sooner action would have been impertinent and discourteous to the State Board and would have been based upon an assumption that they would exceed their authority under the law, when every citizen has a right to assume that public officers will act within the scope of their authority and will obey the law.

XI. "His Honor erred in holding that the establishment of the Central Depository by the State Board of Education did not increase the cost price to the school children of text-books over and above what the same would have cost had there been no Central Depository created by the board.

XII. "His Honor erred in not granting an interlocutory order in each case restraining the State Board of Education from entering into the contract mentioned in the petitions herein, until these proceedings could be heard upon their merits and the facts ascertained and determined in the manner and mode prescribed by law."

*Messrs. Bellinger & Welsh,* for appellant, cite: *Has the petitioner a right to bring this proceeding, or should it be brought in name of State?* High. on Inj., 757, 793, 1547, 1557, 1533, 1556, 1237-8; 44 S. C., 256. *Is a proper case made for injunction?* 67 S. C., 93; 75 S. C., 221.

*Assistant Attorney General D. C. Ray* and *Mr. J. S. Muller,* contra, cite: *Is there error in the holding that the proceeding should be brought by the State?* 64 S. C., 120; 30 S. C., 545; 54 S. C., 250; 18 N. Y., 159; 23 N. Y., 323;

59 N. Y., 27; 63 N. Y., 324; 25 Wash., 221; 79 Mo. App., 679; 160 Ind., 216; 68 Kan., 801; 21 Tex. Civ App., 471; 12 Pet., 91; 9 How., 10; 117 Fed., 983; 50 Ga., 451; 181 Ill., 605. *Will a court of equity grant an injunction against a threatened injury which would be exceedingly small?* 16 Ency., 351, 360; 14 Conn., 565; 7 Pac. R., 984; 70 N. E. R. 543; 90 Me., 17. *Petitioner was guilty of laches:* 18 Ency., 97, 103, 119; 43 S. C., 441; 62 S. C., 89.

September 24, 1907. The opinion of the Court was delivered by

MR. JUSTICE JONES. The petition in each of these cases is addressed to the Justices of this Court, and seeks to enjoin the State Board of Education from entering into certain contracts with certain publishers to furnish school books for the free public schools of the State.

Applications were made before Hon. C. A. Woods, Associate Justice, at chambers, for temporary injunctions, and he, on July 19th, 1906, in an opinion, published in 74 S. C., 560, rendered judgment refusing the temporary injunction sought. The petitioners appeal to this Court from said order on a number of exceptions which, with the complaint and answer and order appealed from, will be set out in the report of this case.

After careful consideration, the exceptions are overruled, and the order of Associate Justice Woods is affirmed for the reasons therein stated.